THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEFFREY A. CHAITOFF | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 7259 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| | ) | |
| EXPERIAN INFORMATION | ) | |
| SOLUTIONS, INC.. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Jeffrey Chaitoff brings this lawsuit against Defendant Experian Information Solutions, Inc., claiming that Experian violated the Fair Credit Reporting Act ("FCRA") by inaccurately reporting his Ocwen Loan Servicing, LLC ("Ocwen") home mortgage as past due during a three-month trial period that preceded a permanent home loan modification agreement. Defendant Experian now moves for summary judgment, arguing there is no issue of material fact as to the following issues: (1) Plaintiff cannot establish the existence of an actionable inaccuracy; (2) Experian's reinvestigation of Plaintiff's dispute was presumptively reasonable; and (3) Plaintiff has no damages resulting from Experian's reporting of his Ocwen mortgage delinquencies during the trial period. Experian argues that because Plaintiff cannot show these facts, there can be no liability under the FCRA. Because there is no dispute of material facts as to the existence of an actionable inaccuracy and as to whether Experian's procedures for reinvestigating Plaintiff's dispute were reasonable, Defendant's Motion for Summary Judgment (Dkt.70) is granted.

## BACKGROUND

The below facts come from Defendant's Rule 56.1 Statement of Facts. (Dkt. 72). Plaintiff is a resident of Florida and is a consumer under the FCRA and Defendant Experian is a consumer reporting agency under the FCRA. (Dkt 72 ¶¶ 1–2). Experian maintains credit information about Plaintiff. (*Id.* ¶ 3).

### I.   Plaintiff's Mortgage

In approximately 1995, Plaintiff purchased a residential property located at 309 Lincoln Ave., Highland Park, New Jersey (the "Highland Park Property") where he lived until September 2016. (*Id.* ¶ 6). Plaintiff refinanced his home in 2012, obtaining a $329,627 mortgage through Ocwen Loan Servicing, LLC. (*Id.*). His monthly payment under his mortgage was $2,950. (*Id.*)

Plaintiff lost his job in human resources in early 2016 and became unable to make his mortgage payments on the Highland Park property. (*Id.* ¶ 7). Plaintiff became late on his payments in early 2016, although he testified he did not remember specifically when he became late on payments. (*Id*). Ocwen reported that Plaintiff was intermittently thirty-days late in his payments from February 2015 through May 2016, with more serious delinquencies starting in June 2016. (*Id.* ¶ 8). By October 2016, Plaintiff was six months late on his mortgage payments, and remained at least six months late until August 2017. (*Id.*).

Plaintiff called Ocwen to inquire about his options for paying the mortgage, and agreed to enter into an unemployment forbearance program, in which he made reduced payments of $570.92 from August 2016 through January 2017 in order to avoid foreclosure. (*Id.* ¶ 9). In April 2017, Plaintiff received a Trial Period Plan Notice from Ocwen, notifying Plaintiff that he was approved to enter into a Trial Period Plan for a standard loan modification. (*Id.* ¶ 10). The Notice stated that Plaintiff had been:

> [A]pproved to enter into a trial period plan under the Standard Modification. Please read this letter so that you understand the next steps that are necessary for you to complete your modification. In order to be considered for a modification you must first complete a trial period…Based on a careful review of the information you provided, we are offering you an opportunity to enter into a Trial Period Plan for a mortgage modification. This is the first step toward qualifying for more affordable mortgage payments or more manageable terms. It is important that you read this information in its entirety so that you completely understand the actions you need to take to successfully complete the Trial Period Plan to permanently modify your mortgage.

(*Id.*). The Trial Period Plan required that Plaintiff make trial payments of $2,661.20 in May, June, and July 2017 in order to permanently modify his mortgage and indicated that "Once you have successfully made each of the payments above by their due dates, you have submitted two signed copies of your modification agreement, and we have signed the modification agreement, your mortgage will be permanently modified in accordance with the terms of your modification agreement. (*Id.* ¶ 11). The Trial Period Plan Notice stated further:

> [E]xcept for your monthly mortgage payment amount during the trial period, the terms of your existing note and all mortgage requirements remain in effect and unchanged during the trial period. . . .Your current loan documents remain in effect; however, you may make the Trial Period Plan payment instead of the payment required under your loan documents: - You agree that all terms and provisions of your current mortgage note and mortgage security instrument remain in full force and effect and you will comply with those terms; and that nothing in the Trial Period Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the loan documents.

(*Id.* ¶ 12). Finally, the Trial Period Plan included the following provision regarding the manner in which Ocwen would report the delinquent payments on Plaintiff's account:

> Credit Reporting: We will continue to report the delinquency status of your loan to credit reporting agencies as well as your entry into a Trial Period Plan in accordance with the requirements of the Fair Credit Reporting Act and the Consumer Data Industry Association requirements. CREDIT SCORING COMPANIES GENERALLY CONSIDER THE ENTRY INTO A PLAN WITH REDUCED PAYMENTS AS AN INCREASED CREDIT RISK. AS A RESULT, ENTERING INTO A TRIAL PERIOD PLAN MAY ADVERSELY AFFECT YOUR CREDIT SCORE, PARTICULARLY IF

3

> YOU ARE IS [sic] CURRENT ON YOUR MORTGAGE OR OTHERWISE
> HAVE A GOOD CREDIT SCORE. For more information about your credit
> score, go to ftc.gov/bcp/edu/pubs/consumer/credit/cre24.shtm

(*Id.* ¶ 13).

At the time Plaintiff received the Trial Period Plan Notice in April 2017 and made his first Trial Period Plan payment in May 2017, he was more than six months delinquent in making payments to Ocwen pursuant to the terms of his mortgage agreement. (*Id.* ¶ 14). Plaintiff successfully made the Trial Period Plan payments of $2661.20 in each of May, June, and July 2017. (*Id.* ¶ 15). Following Plaintiff's successful completion of the Trial Period Plan, the modification of Plaintiff's Ocwen loan was implemented effective August 1, 2017. (*Id.* ¶ 16).

Starting in August 2017, Ocwen reported Plaintiff's account as being timely paid with no delinquencies from August 2017 forward. (*Id.*). On or around April 24, 2018, Plaintiff contacted Ocwen via telephone to express concerns relating to the credit reporting of his Ocwen loan during the time he was completing his unemployment forbearance plan and trial modification. (*Id.* ¶ 17). Ocwen's Office of the Consumer Ombudsman responded via letter on May 1, 2018, confirming the accuracy of its credit reporting. (*Id.*). Plaintiff obtained a mortgage and purchased a home in Orlando, Florida, in September 2019. (*Id.* ¶ 18).

## II. Plaintiff's Credit File and Disputes

On May 21, 2018, Experian received a dispute letter from Plaintiff dated May 14, 2018. (*Id.* ¶ 29). Plaintiff's dispute letter related to his home mortgage account with Ocwen, and stated that he had "made each monthly payment on time consistently throughout 2017" and that "the [Ocwen] trade line should reflect the payments were made timely." (*Id.*). Attached to this dispute were documents purporting to be from Ocwen regarding trial payments made pursuant to a Trial Period

4

Plan preceding a potential loan modification. (*Id.*). On May 28, 2018, Experian processed Plaintiff's dispute. (*Id.* ¶ 30).

Because Plaintiff was disputing delinquent payment history for which he had produced no proof of payment, the agent handling Plaintiff's dispute sent an Automated Consumer Dispute Verification ("ACDV") to Ocwen that day, which attached all documents submitted by Plaintiff as part of his dispute, and requested that Ocwen verify the account status and history. (*Id.*). Ocwen responded on May 29, 2018, indicating that Plaintiff had delinquent payment history. (*Id.* ¶ 31). With regard to Plaintiff's payment history, Ocwen's reporting indicates that Plaintiff was at least 180 days past due in his payments to Ocwen from October 2016 through July 2017. (*Id.*). Experian updated Plaintiff's Ocwen account in accordance with Ocwen's ACDV response on May 30, 2018. (*Id.* ¶ 32).

On May 30, 2018 Experian sent Plaintiff an updated consumer disclosure detailing the results of its reinvestigation. (*Id.* ¶ 33). The dispute results sent to Plaintiff included the following paragraph, "[w]e reviewed the documentation you provided with your dispute, but determined that it was not sufficient to make the changes or deletions you requested. We then forwarded your documentation to the furnisher of the information, along with a description of your dispute, and asked them to investigate your dispute. If the item you disputed was a public record, we contacted the vendor who collected the information from a public record source and asked them to verify the public record information. The results of our reinvestigation are included here." (*Id.*).

On July 5, 2018, Experian received a second dispute letter from Plaintiff, dated July 2, 2018. (*Id.* ¶ 34). Plaintiff's dispute letter related to his home mortgage account with Ocwen and stated that he had "made each monthly payment on time consistently throughout 2017" and that "the [Ocwen] trade line should reflect the payments were made timely." (*Id.*). Attached to this dispute

5

were documents purporting to be from Ocwen regarding trial payments pursuant to a Trial Period Plan preceding a potential loan modification. (*Id.*).

On July 11, 2018, Experian processed Plaintiff's dispute. (*Id.* ¶ 35). Because Plaintiff was disputing delinquent payment history for which he had produced no proof of payment, the agent handling Plaintiff's dispute sent an ACDV to Ocwen that day. (*Id.*). The ACDV attached all documents submitted by Plaintiff as part of his dispute and requested that Ocwen verify all information reporting on Plaintiff's account. (*Id.*).

Ocwen responded on July 15, 2018. (*Id.* ¶ 36). Ocwen's reporting indicates that Plaintiff was at least 180 days past due in his payments to Ocwen from October 2016 through July 2017. (*Id.*). Experian updated Plaintiff's Ocwen account in accordance with Ocwen's ACDV response on July 16, 2018. (*Id.* ¶ 37). Experian sent Plaintiff an updated consumer disclosure detailing the results of its reinvestigation the same day. (*Id.*). Experian did not receive any other correspondence from Plaintiff following his July 2018 dispute letter, until the filing of this lawsuit. (*Id.* ¶ 38). The Ocwen account was deleted from Plaintiff's credit file at the request of Ocwen on January 17, 2019. (*Id.* ¶ 39).

### III. Experian's Procedures

Experian, which is a "consumer reporting agency" as defined by the FCRA, gathers information and data regarding consumers from various vetted and contracted sources, which it uses to create consumer files on more than an estimated 280 million consumers in the United States. (*Id.* ¶ 19). Experian's procedures for assuring the maximum possible accuracy of reported credit include working with data furnishers to ensure that they supply the most complete and accurate data possible, subjecting all incoming data to numerous systems and checks designed to prevent errors, continually reviewing and refining Experian's computer systems in an ongoing

effort to assure the maximum possible accuracy of information in Experian reports, and working with consumers to proactively prevent errors in consumer credit reports. (*Id.* ¶ 20). Before permitting information received from one of its vetted and contracted data furnishers to enter its credit reporting database, Experian validates and assesses the accuracy of the data using rigorous quality control and statutory compliance procedures to ensure only accurate information is added to a consumer's file. (*Id.* ¶ 21).

Experian's procedures include assuring the reliability of the data furnisher before it will accept their data into Experian's credit reporting database. (*Id.* ¶ 22). Experian only accepts credit information from data furnishers that have been vetted through Experian's stringent membership process, which entails multiple steps, including but not limited to, on-site physical inspections of the furnisher's facilities, audits of the furnisher's credit data, background and business conflict checks, and security checks. (*Id.*). Before data furnishers are permitted to supply information to Experian, the furnishers must complete the on boarding process, and must execute contracts and data agreements agreeing to comply with the obligations imposed by the FCRA to furnish accurate information and follow industry reporting standards in the "Metro 2" Format, an industry-wide reporting format that standardizes the computer layout for credit reporting to ensure the integrity and consistency of the data. (*Id.*).

Consumers who disagree with the accuracy of any items of credit information appearing in their file disclosure (or in a consumer credit report provided to a credit grantor) may submit disputes of those items to Experian through one of three ways – consumers may send disputes to Experian by U.S. mail, consumers may call Experian at a toll-free number to dispute, or consumers may use Experian's online system, either directly, or indirectly through a reseller. (*Id.* ¶ 24). Upon receiving notice of a dispute from a consumer, Experian initiates its "reinvestigation" process,

wherein Experian reviews all relevant information provided by the consumer and uses it, if possible, to verify the identity of the consumer, to identify the item(s) being disputed, and to determine the nature of any alleged inaccuracies. (*Id.* ¶ 25). In many disputes, the nature of the dispute is such that Experian must contact the furnisher and ask them to verify the accuracy of the disputed information. (*Id.*).

When Experian externally disputes an item, requesting that the data furnisher verify the information, Experian will send an Automated Consumer Dispute Verification ("ACDV"). (*Id.* ¶ 26). The ACDV identifies the consumer and the account information currently being reported, identifies the basis for the dispute, and asks the data furnisher to verify or update the reported information, and any documents and information submitted by the consumer as part of their dispute will generally be attached to the ACDV that Experian sends to the data furnisher. (*Id.*). The data furnisher then returns the ACDV to Experian, instructing Experian to either leave the item as it is, to delete the item, or to change or update it in some specified manner. (*Id.*). Furnishers are required to review the ACDV and either verify or update the disputed reporting. (*Id.* ¶ 27). When the furnisher responds to the ACDV, they specifically represent that they have verified the accuracy of the information contained in the response. (*Id.*). Once this process is complete, Experian sends the consumer dispute results summarizing the results of the reinvestigation. (*Id*).

Experian used all of the aforementioned procedures and quality checks and controls designed to ensure the accuracy of its credit reporting activities when dealing with Plaintiff. (*Id.* ¶ 28). Experian had no reason to doubt the accuracy of information provided by Ocwen during the time period relevant to this action because Experian subjected Ocwen to all of Experian's quality control measures explained above, including putting Ocwen through Experian's stringent vetting process and requiring Ocwen to execute contracts agreeing to comply with its obligation under the FCRA

to furnish accurate data. (*Id.*). There is no indication in Experian's records that Ocwen was a prevalent source of unreliable information. (*Id.*).

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party." *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018) (citation omitted). The Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## DISCUSSION

As a threshold matter, the FCRA requires a plaintiff to show that a consumer reporting agency prepared a report containing inaccurate information, stating that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b); *see also Denan v. Trans Union, LLC*, 959 F.3d 290, 293–94 (7th

Cir. 2020) (discussing how a consumer reporting agency cannot be held liable under the FCRA if it did not report inaccurate information); *Walton v. BMO Harris Bank N.A.*, 761 F. App'x 589, 591 (7th Cir. 2019) (holding same); *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 971 (7th Cir. 2004) ("[T]o state a claim under [§ 1681e(b)], a consumer must sufficiently allege that a credit reporting agency prepared a report containing inaccurate information." (internal citations and quotation marks omitted)). Section 1681e(b) does not explain what it means to be "inaccurate," nor does it draw a line between factual and legal "accuracy." *Denan*, 959 F.3d at 294. Yet, the FCRA does not require unfailing accuracy from consumer reporting agencies, instead requiring a consumer reporting agency to follow "reasonable procedures to assure maximum possible accuracy" when it prepares a credit report. *Id.*

Defendant argues that it cannot be held liable under the FCRA because: (1) Plaintiff cannot establish the existence of an actionable inaccuracy; (2) Experian's reinvestigation of Plaintiff's dispute was reasonable; and (3) Plaintiff has no damages resulting from Experian's reporting of his Ocwen mortgage delinquencies during the trial period. The Court need only look to these first two issues because there is no issue of material fact about whether the information Experian reported was accurate and whether its reinvestigation was reasonable.

### I. The Accuracy of Plaintiff's Information

Plaintiff maintains that the information Defendant reported was inaccurate because despite Plaintiff entering into a TPP and making the payments instructed, Experian reported Chaitoff as being delinquent during each of May, June, and July without any mention that Chaitoff had entered into a TPP and timely paid the modified payment amount. However, there is no dispute as to the accuracy that Chaitoff was delinquent on his payments when he began his TPP and he was, in fact, delinquent during the three-month period. (Dkt. 72 ¶¶ 7–8, 17). The TPP Notice that Plaintiff

received and agreed to in April 2017 stated that, "[i]n order to be considered for a modification you must first complete a trial period…This is the first step toward qualifying for more affordable mortgage payments or more manageable terms." (*Id.* ¶ 10). The Notice stated that Plaintiff's mortgage would only be permanently modified after he had "successfully made each of the payments" in May, June, and July 2017. (*Id*. ¶ 11). The Notice further advised Plaintiff that "[y]our current loan documents remain in effect; however, you may make the Trial Period Plan payment instead of the payment required under your loan document" and that Ocwen would "continue to report the delinquency status of [Plaintiff's] loan to credit reporting agencies." (*Id*. ¶¶ 12–13).

Plaintiff does not dispute that the Notice advised him of these facts, nor does he dispute that he was delinquent during these trial months. (*See* Dkt. 77). Essentially Plaintiff's dispute is not over whether Defendant reported inaccurate information, his dispute lies with Ocwen about their reporting to Experian of his loan modification. Plaintiff's claim, then, is about the legal accuracy of his loan modification, but not the factual accuracy. Plaintiff cites a litany of out-of-circuit cases that he claims bolster his argument. However, the Seventh Circuit has clarified recently that the FCRA imposes credit reporting agencies to adopt "'reasonable procedures' to ensure accuracy," but it does not require them to evaluate "non-adjudicated legal defenses to [consumers'] debts." *Denan*, 959 F.3d at 295. Additionally, while § 1681i(a) "requires consumer reporting agencies to 'conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate,'" they are "neither qualified nor obligated to resolve legal issues," but the FCRA's implementing regulations require only furnishers, not reporting agencies, to ensure that debt information "correctly [r]eflects … liability for the account." *Id*. at 295 (citation omitted). Plaintiff does not dispute the accuracy of the information, only that the information Ocwen

11

reported to Experian was legally inaccurate because his loan was modified by the TPP. However, the liability for this does not lie with the consumer reporting agency. *See Walton*, 761 F. App'x at 591 (Finding that credit reporting agency not liable under FCRA where only reporting accurate information received from bank about loan payment delinquency).

Plaintiff cites to a Sixth Circuit case he claims is on point, *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 630 (6th Cir. 2018). However, even if this case were binding precedent, it would still not apply to the facts in this case. Namely, in *Pittman*, the Sixth Circuit held iServe, the loan servicer which granted the plaintiff a TPP, and BSI, the company that was assigned the loan, liable under the FCRA for reporting the plaintiff's mortgage payments as past due despite the loan modification. Nothing in the case could be construed to hold a consumer reporting agency liable for reporting accurate information regarding the TPP that it received from the loan servicer.

Plaintiff claims that "Experian's reporting is also inaccurate because Experian failed to report Chaitoff's dispute as required by the FCRA. Despite receiving two disputes from Chaitoff, Experian chose to conceal this information within its reports rather than comply with its obligation to publish the in-dispute notation under 15 USC § 1681i(c)." (Dkt. 76 at 7–8). Plaintiff provides zero factual support for this assertion, and in fact, Defendant's supplied facts rebut this. (Dkt. 72 ¶¶ 33, 37).

Because there is no issue of material fact pertaining to whether Experian reported accurate information, Experian's Motion for Summary Judgment is granted.

**II.     The Reasonableness of Procedures**

Experian argues that even if it had reported inaccurate information, the Court should still grant summary judgment because the procedures Experian used to reinvestigate Plaintiff's dispute were reasonable. When a consumer disputes the "accuracy of any item of information" contained

in a credit report, § 1681i requires consumer reporting agencies to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate." 15 U.S.C. § 1681i(a)(1)(A). As with a § 1681e(b) claim, "a consumer disputing the legal validity of a debt that appears on her credit report should first attempt to resolve the matter directly with the creditor or furnisher, which stands in a far better position to make a thorough investigation of a disputed debt than the [consumer reporting agency] does on reinvestigation." *Denan*, 959 F.3d at 296 (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010)). A credit reporting agency is not liable under the FCRA if it followed "reasonable procedures to assure maximum possible accuracy," but nonetheless reported inaccurate information in the consumer's credit report. *Sarver*, 390 F.3d at 971–72 (citing *Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994)). The reasonableness of a reporting agency's procedures is normally a question for trial unless the reasonableness or unreasonableness of the procedures is beyond question. *Id.* at 971 (citing *Crabill v. Trans Union, LLC*, 259 F.3d 662, 663 (7th Cir. 2001). Yet, the FCRA "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Id.* at 972 (citation omitted).

In *Sarver*, the Court stated that Experian, relying on an affidavit from a compliance manager, provided an accounting of its procedures that detailed the safeguards in place to ensure accuracy. *Id.* Here, Experian has provided an affidavit from Cymone Rogers, a Senior Legal and Compliance Specialist discussing the extensive procedures in place to safeguard accuracy.[1] There

---

[1] Rogers's affidavit states "My job responsibilities have included processing, analyzing, and responding to consumer disputes. Based upon my experience with Experian, I am familiar with Experian's policies and procedures for the compilation, retention, reinvestigation, and disclosure of consumer credit information, as well as Experian's computer systems used in doing so. I am also familiar with the records maintained by Experian in the course of conducting its business activities, including without limitation, Plaintiff's Experian consumer file." (Dkt. 72-3 ¶ 2).

13

is no genuine dispute that Experian relied on sources it reasonably believed to be reputable, nor is there even an allegation that Experian had any notice of systematic problems with its procedures. (Dkt. 72 ¶¶ 20–23, 28.)

Plaintiff does not dispute the factual accuracy of the recitation of Experian's procedures, but instead claims that Experian cannot rely upon the affidavit supplied by its Senior Legal and Compliance Specialist because it does not comport with Fed. R. Civ. P. 56(c)(4) because the statements are "self-serving and based on speculation, conjecture, and inadmissible hearsay." (Dkt. 77 at 6–14). Plaintiff seeks to require Experian to include additional documents to support the Rogers's affidavit. However, there is no requirement for Defendant to cite to other portions of the record to support its Compliance Specialist's declaration when her statement is directly based on her own personal knowledge. Fed. R. Civ. P. 56(c)(4); *see also Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 869 (N.D. Ill. 2010).

Plaintiff claims that the affidavit is "conclusory" and therefore improper. (Dkt. 77 at 7–11, citing *RB&W Mfg. LLC v. Buford*, 263 F. App'x 486, 490 (7th Cir. 2008)). "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998). However, the Rogers's affidavit is a thorough accounting of Experian's procedures based on her own personal knowledge gained through years of work as a Compliance Specialist. It is unclear how the affidavit is "conclusory" because Plaintiff does not explain his argument. Just as the compliance manager's affidavit in *Sarver* was sufficient to set out Experian's procedures, the Compliance Specialist's affidavit here is sufficient.

14

Aside from Plaintiff's arguments that the affidavit was otherwise improper, Plaintiff does not dispute that the procedures Experian used are otherwise reliable. Indeed, the procedures described by Experian here are similar to those described in *Sarver*. Yet Plaintiff claims that Experian was "on notice" that the information that it was receiving from Ocwen was inaccurate because Plaintiff had reported issues twice, and that therefore Experian's procedures were unreasonable. However, the law is clear that the FCRA is not a strict liability statute and Experian was not on notice until Plaintiff contacted Experian about a potential error. *Walton*, 761 F. App'x at 592; *Sarver*, 390 F.3d at 971 ("As we have made clear, the FCRA is not a strict liability statute."). The FCRA "does not hold a reporting agency responsible where an item of information, received from a source that it reasonably believes is reputable, turns out to be inaccurate unless the agency receives notice of systemic problems with its procedures." *Sarver*, 390 F.3d at 972. While Experian was put on notice of a potential error when Plaintiff contacted Experian, Experian took reasonable action afterwards to ensure the information it was receiving from Ocwen was accurate. Plaintiff does not present any additional facts that Experian's procedures for reinvestigating Plaintiff's claim were unreasonable.

## CONCLUSION

There is no dispute of material facts as to the existence of an actionable inaccuracy and whether Experian used reasonable procedures for reinvestigating Plaintiff's dispute. Therefore, Defendant's Motion for Summary Judgment (Dkt.70) is granted.

_____
Virginia M. Kendall
United States District Judge

Date: May 12, 2021